JOURNAL ENTRY AND OPINION
{¶ 1} On June 28, 2007, we dismissed this appeal for lack of jurisdiction. We held that since the certified record on appeal did not contain an original judgment entry, signed by the judge and journalized, finding Turner guilty and sentencing him, that there was no final appealable order. Moreover, Turner had moved for a new trial, which the judge had apparently denied orally (according to both Turner and the city), but there was no signed and journalized entry in the record on appeal. *Page 3 
 {¶ 2} Turner timely moved this court to reconsider our decision. The city did not respond. We now grant Turner's motion for reconsideration and sua sponte supplement the record with the original, signed and journalized judgment entries that were missing from the record on appeal. As such, this court has jurisdiction to consider the merits of the appeal.
 {¶ 3} Defendant-appellant, Peter Turner, appeals from a judgment of the Cleveland Municipal Court, finding him guilty of inciting to violence and sentencing him. For the following reasons, we reverse and remand.
 {¶ 4} In October 2005, the city of Cleveland filed a complaint against Turner for inciting to violence, in violation of R.C. 2917.01(A), a first degree misdemeanor, and for assault, in violation of Cleveland Codified Ordinance ("CCO") 621.03, also a first degree misdemeanor. Turner made his first appearance and entered a plea of not guilty to the charges.
 {¶ 5} The case proceeded to a jury trial. The following facts were adduced at trial.
 {¶ 6} Sean Kane, a bar back for Castlebar Tavern in Cleveland, Ohio, testified first for the city.[1] He was working on August 6, 2005, when a fight broke out in the bar. He saw Aric Jackson, Jamie Cuxton, and Amy Collins come into the tavern that night and sit down at the bar. Cuxton and Collins were sitting on *Page 4 
either side of Jackson. He then saw the two women get up from their bar stools to go to the restroom. When they did, Kane observed Turner and William Forrest get up from where they were sitting, walk down to the other end of the bar, and sit where the women had been sitting, on either side of Jackson.
 {¶ 7} Kane stated that he "heard comments that night, but who said them [he] couldn't say for certain." He further stated, "I did hear a racial comment. I couldn't see who said it." When asked what the racial comment was, he replied, "buy every black person in the bar a beer, but they didn't say `black person.'" He agreed that "[t]hey said the `N' word."
 {¶ 8} When asked by the prosecutor if Forrest and Turner were being friendly to Jackson when they went to sit by him, Kane replied no. When asked why he thought that, Kane stated, "[g]oing back to that racial comment I heard earlier, it was obvious. They shout[ed] something racial like that for the whole bar to hear."
 {¶ 9} Kane did not see the two women come back from the restroom, but he saw Jackson get up from his seat and saw "either Mr. Turner or Mr. Forrest" push Jackson into a corner. When Jackson was in the corner, Turner and Forrest got "[r]ight up in his face." Jackson "retaliated" by "[t]hrowing punches, throwing blows." Kane explained, "almost the first shot [Jackson] threw he knocked Pete Turner out." *Page 5 
 {¶ 10} Kane further stated that as soon as the physical alteration occurred, the owner of the bar, Jeff Powers, jumped off of his stool, instructed Kane to call 9-1-1, and went to where the fight was happening. After the police arrived, Kane testified that he said to Forrest, "[y]ou got up to mess with that black kid over there. You got your ass kicked. You got messed up over there."
 {¶ 11} Kane admitted on cross-examination that he did not see Turner push Jackson, hit Jackson, or hear Turner say the word "nigger." He did see Jackson hit Turner one time, but explained that "he was retaliating against the two gentlemen who got up harassing him."
 {¶ 12} Forrest testified next. He stated that he is a police officer for the city of Cleveland, but that he was currently suspended. He testified that he received a subpoena from Turner's counsel, but then declined to answer each question asked by the city or Turner.
 {¶ 13} Melinda McKeown, a bartender for Castlebar Tavern, took the stand after Forrest. She was working on the night in question. She saw Jackson, Cuxton, and Collins walk into the bar around 1:00 a.m. and sit down. They were not intoxicated when they arrived. Turner and Forrest, who were regular customers, were already at the bar when she arrived that night at 7:00 p.m. They both appeared to be intoxicated by the time Jackson and the two women arrived. *Page 6 
 {¶ 14} McKeown stated that she observed Turner and Forrest watching Jackson and the two women from the time they came in the bar. When the two women got up to go to the restroom, she saw Turner and Forrest get up from their bar stools, walk down to where Jackson was sitting, and sit on either side of him.
McKeown agreed that she heard someone shout several times, "buy every `N' word in the bar a beer[.]" However, she clarified that she heard Forrest say it several times, but she "couldn't honestly [say] for sure if [Turner] had said anything exactly like that." But then soon after she testified to that, she stated she heard both Turner and Forrest say, "[h]ey Mindy, why don't you buy this nigger a beer?" Jackson acted like he did not hear it. She said that she was surprised at the time that Jackson had not snapped, because "those kind of things would upset somebody."
 {¶ 15} At one point in the night, McKeown stated that she wrote Jackson a note that said, "I'm sorry for these two jerks. If I thought I could help, I would, but I don't want to see a fight. They're police." She then identified the note in court.
 {¶ 16} McKeown said that she did hear one of the two women say, "[w]hy don't you turn around and mind your own business. You're an asshole." At that point, McKeown said she was attempting to call for Powers, but then a fight broke out. She did not see the fight break out. When she turned around, there *Page 7 
was a "pile of people," but she did see Turner's head hit the bar very hard. Powers and another man went to break up the fight.
 {¶ 17} On cross-examination, McKeown stated that she was sure Forrest said "nigger" several times, but she admitted she did not know if Turner ever said it. She agreed that she never heard Turner use the word "nigger" in the past.
When asked why she did not tell Turner and Forrest to stop harassing Jackson, McKeown explained that Forrest had called her over at one point and "said Mindy — something about you know what I do for a living, right, and then he said something * * * [t]hen he said, "[b]uy the nigger a beer." McKeown said that she replied, "Billy, I know what you're trying to do. I don't want any part of it." She said that she directed that statement to both Turner and Forrest. She admitted that she did not see Turner hit anyone, including Jackson.
 {¶ 18} McKeown stated on redirect-examination that Turner and Forrest were "right in — up in [Jackson's] head singing as loud and [sic] they could."
 {¶ 19} Jackson testified after McKeown. He said that Cuxton was his girlfriend and Collins was her Canadian cousin who was visiting. When they arrived, they ordered a drink and then walked to the back of the bar to play the bowling machine for twenty to twenty-five minutes. They then went back to the bar and sat down.
 {¶ 20} Jackson said he was sitting between Cuxton and Collins when they got up to go to the restroom. At that point, he explained how two "gentlemen *Page 8 
came down and sat on each side of me and started to do what I call roughhousing me, or taking up lots of space, talking through me as if I wasn't there, waving their hands back and forth." He explained that "roughhousing" meant "[e]lbows, legs stretched wide open, flared out shoulders, taking up mass room, attempting to crowd me out, or I say, talk through me as if I wasn't there, literally with hand gestures back and forth like so across my face (indicating) elbows out, legs-[.]" He said he felt as if they were trying to belittle him. He also said the gentleman on his left, later identified as Forrest, "stared me down for, I would say, halfway through a cigarette, about 12 inches from my face." Jackson ignored him.
 {¶ 21} Jackson stated that the two men "took all the change and the drinks that were in front of them and pushed it to the end of the bar." He explained that the drinks and money were Cuxton's and Collins'. Jackson denied that he heard anyone say, "buy that nigger a beer."
 {¶ 22} When Cuxton and Collins came back, Jackson said he got up from his seat and moved farther down the bar and the two women sat next to him.[2] Forrest and Turner were talking to each other, but Jackson testified that he did not hear anything they said because he tuned them out. Forrest was also talking to Cuxton, whispering things to her. At one point in the night, the bartender handed him a note. He stated that Cuxton grabbed the note and it ripped. *Page 9 
Jackson looked over Cuxton's shoulder and saw that the note said, "I'm sorry," and he figured out what the "gist" of it was. So, he stated that he did not even look at it; he just put it in his pocket.
 {¶ 23} Jackson testified that he heard Cuxton say to Forrest, "what is it I see in black men." Then, Jackson said that he saw Forrest "giving [Cuxton] elbows in her back." Turner was talking to Forrest the whole time.
 {¶ 24} Jackson said, "[a]fter a series of elbows, [Forrest] decides to grab [Cuxton], and what I know is a combination of [Cuxton] and chair, and slam her to the ground, knocking her out of her chair." Jackson leaned forward and caught her. Forrest was trying to push Cuxton down, and at that point, "Turner slaps the bar, spins clockwise out of his chair, and comes down and asks me, `What the fuck am I going to do about it[?]' because I asked [Forrest] what [he was] doing." At that point, both Forrest and Turner turned their attention to Jackson. They began to walk closer to Jackson, "closing the ground down on [him] on the wall." Jackson said that they were waving their arms at him, and that someone touched him, but he was not sure who.
 {¶ 25} In response, Jackson said that the first thing he did was push Forrest, to let him know, "don't touch me." Then, he also pushed Turner. At that point, Jackson said that they were both coming toward him, and Jackson told them, "I will hit you with a beer. I don't want any trouble." But he put the beer down, and they were still pushing and coming toward him faster, so he pushed *Page 10 
Forrest even harder. He then saw Turner take a step and "drop his center of gravity," which made him believe that Turner was coming after him. Jackson said his back was up against the wall, and that was when he "struck [Turner] with two lefts and three rights." He explained that there was no way for him to escape. Two other men had come, who he learned during the trial that one was Turner's brother, Hans Turner. Jackson said all of the men were "rushing" him and he was throwing punches at them.
 {¶ 26} Jackson further stated that someone else came from the side of the bar. He thought the man was going to help him, but the man dove at his legs. He later learned that it was Powers. They continued to wrestle. Powers was holding him down while these three remaining men were trying to fight him, so he bit Powers on the finger. Jackson said that he really did not get punched or injured because no one hit him too hard.
 {¶ 27} When the fight had ended, Jackson said, "I'm out of here," and Powers told him that he wasn't going anywhere, because he was "the fucking owner." Jackson testified that he was "flabbergasted" when he learned that Powers was the owner.
 {¶ 28} Jackson finally walked out the door and the saw a police officer. Jackson said that Powers walked out of the bar and stated, "[a]rrest that nigger." When Powers said that, Jackson gave the bartender's written note to the police officer. Jackson then went to the hospital. He had lacerations and swelling. *Page 11 
 {¶ 29} On cross-examination, Jackson explained that when he was at Hillcrest Academy, he trained in Jujitsu for three to four years. Jackson said that it was Forrest who stared him down, not Turner. However, Jackson did say that Turner got close to his face while they were sitting at the bar. It was also Forrest who moved the money and drinks down, not Turner. He also admitted that Turner never pushed him; i.e., it was Forrest.
 {¶ 30} Jackson further admitted that he never heard Turner say the word "nigger." In fact, he said that he never heard anyone use the word "nigger" that night. However, he agreed that he just tunes that word out and that it does not offend him. He stated that he said to Cuxton, "They're cool. They tried to buy me a beer." But, he denied that Turner actually bought him a beer.
 {¶ 31} When asked if Turner said anything at all to him when he was sitting at the bar, Jackson replied that he did. When asked to clarify, Jackson responded, "[s]lurs and mumbles." When asked if it was an offensive slur, Jackson stated, "I don't understand slurs and mumbles." When asked how he knew that Turner was talking to him, he said, "[h]e's right in my ear." He said that Turner never spoke to Cuxton that night.
 {¶ 32} Jackson further admitted that he did not say in his first written statement, of August 6, 2006, that Turner jumped up from the bar and said, "[w]hat the fuck are you going to do about it?" In fact, he agreed that he never mentioned Turner in his first statement to the police. *Page 12 
 {¶ 33} Officer Gary Helscel ("Officer Helscel") testified after Jackson. He stated that when he arrived at the scene, he interviewed three people: Jackson, Cuxton, and Collins. He said that all three of them were visibly upset and shaking. He also interviewed the bar back, Kane, and the bartender, McKeown. He reported that all five essentially gave the same statement to him as to what happened that night. Jackson also gave him the written note from McKeown.
 {¶ 34} On cross-examination, Officer Helscel stated that he did not hear Powers come out of the bar and say, "[a]rrest that nigger." Powers did tell him that Jackson bit him in the finger. Officer Helscel stated that Jackson told him that people in the bar kept using the word "nigger." Officer Helscel agreed that if Jackson testified in court that no one used the word "nigger" inside the bar, that would be incorrect.
 {¶ 35} Sergeant Kevin Dunlay ("Sergeant Dunlay") testified that when he arrived at the scene, he spoke with Jackson and Cuxton. As they were giving him a description of the man who assaulted them, Forrest walked out of the bar. They both pointed at Forrest and said, "[t]hat's the guy that assaulted us."
 {¶ 36} Sergeant Dunlay said that he went into the bar and interviewed Kane and McKeown. They both gave him the same story, which was almost identical to the story told by Jackson and the two women. Sergeant Dunlay stated that he told "both Mr. Powers and Mr. Jackson, I said this is 2005. Don't think this stuff is just going to go away. * * * [I]t will be investigated[.]" *Page 13 
 {¶ 37} On cross-examination, Sergeant Dunlay confirmed that Jackson and Cuxton did not mention Turner that night, only Forrest.
 {¶ 38} Sergeant Sammy Morris ("Sergeant Morris") testified that he works in the Internal Affairs Unit of the city of Cleveland Police Department. He stated that he went to the hospital with Sergeant Carla Ellis ("Sergeant Ellis") and Sergeant Wilmore Larry ("Sergeant Larry"). He indicated that all three officers were present when he interviewed Jackson, Cuxton, and Collins. He said that Jackson felt that he was the victim of a racially motivated crime. Cuxton told them the same thing.
 {¶ 39} Sergeant Morris also interviewed Kane and McKeown. They told him the same basic story about what happened that night, which was also similar to the story told by Jackson, Cuxton, and Collins.
 {¶ 40} Hans Turner, Peter Turner's brother, then testified. Hans said that he and his brother are police officers for the city of Cleveland. Hans testified that he arrived at Castlebar on the night in question around 12:30 or 1:00 a.m. His brother and Forrest were already there when he got there. Hans said that he did not see the fight begin, but he did see his brother lying on the floor, bleeding from his head.
 {¶ 41} On cross-examination, Hans said that within thirty seconds, he was able to wake his brother up and get him out of the bar. He stated that his brother did not appear to be intoxicated. *Page 14 
 {¶ 42} On redirect-examination, Hans read his statement that he gave to Internal Affairs' officers, which said, "Did either of the parties involved appear to be intoxicated? Answer: Pete appeared to be intoxicated. Forrest, I can't say. I didn't talk to him much. Powers, I would say slightly intoxicated. Jackson, I couldn't say either way." However, Hans said that his brother wasn't slurring his speech or having trouble standing.
 {¶ 43} Cuxton was the last witness presented by the city. She testified that when she and Collins came out of the restroom, Forrest and Turner were in their seats and she said, "[w]here are our drinks?" She never heard anyone say, "buy every nigger in the bar a beer."
 {¶ 44} While they were sitting there, Forrest began elbowing her in her back. Forrest then tapped her on the shoulder and asked her "what do you see in niggers?" She responded, "It's a big dick thing. You wouldn't know nothing about that, and you probably can't get yours up any more, so why don't you turn the fuck around and mind your own business." Cuxton also said that she told Forrest "he needed to quit worrying about me, and worry about his complexion and go see a dermatologist." Forrest said, "What do you mean by that?" Cuxton replied, "Dude, it's all up in your grill. Go see a dermatologist."
 {¶ 45} Cuxton testified that she said to Collins, "I hate ignorant, white trash people, racist, hillbillies. Don't know how to mind their own business." Forrest responded, "Are you talking to me?" She told him that she was talking to her *Page 15 
cousin, not him. He said, "I believe you were talking to me, and I believe you need to mind your own business," and then that is when he "started to pick my chair up from the side, and he leaned me out of my chair" and "pushe[d] me to the ground."
 {¶ 46} When asked, "How do you know Turner had anything to do with this conversation?" She replied, "Because, I could hear them talking, and then [Forrest] would say something to me and then he'd go back, talk to Turner, and then [Forrest] would say something to Turner, then he would come back and say something to me." When further asked, "* * * did Turner say anything[,]" she stated, "I could not hear Turner clearly."
 {¶ 47} At the point where Forrest pushed her out of her chair, Jackson started to pick her up and he asked them what they were doing. That is when Turner got up and said, "what are you going to do about it, and then Turner and [Forrest] rushed him and started hitting him." She did not see who hit who first. She said that Jackson was fighting four men at one time, on the bottom of the pile.
 {¶ 48} Cuxton testified that when she was talking to the officer outside, Forrest came out of the bar and said, "there is the nigger, arrest him." She said that she told the police, referring to Forrest, "That's him right there, who started it." *Page 16 
 {¶ 49} On cross-examination, Cuxton was asked, "Pete Turner never said a thing to you, did he?" She replied, "Not directly to me, no." When further asked, "In fact, you never heard anything that Pete Turner said that night to Bill Forrest when he was sitting there[,]" she replied, "I could only hear the mumbles." When asked if she just made an assumption that Turner was talking about her, she stated, "I don't know what he was saying."
 {¶ 50} She agreed that she complained about Forrest to Jackson and that Jackson told her, "He's cool. He's just drunk and they bought me a beer."
 {¶ 51} Both Turner's and the city's appellate brief state that at the close of the city's case, Turner moved for a Crim.R. 29 acquittal on both the inciting to violence charge and the assault charge. We only have excerpts of the trial transcript, specifically the witnesses' testimony. We do not have the oral testimony of Turner moving for an acquittal. Nevertheless, while the trial was still in progress, the trial court issued two written orders, one granting a Crim.R. 29 motion with respect to the assault charge, and one denying it with respect to the inciting to violence charge.
 {¶ 52} Turner presented two witnesses in his defense, his wife, Antoinette Turner and himself.
 {¶ 53} Antoinette testified that she and Turner have two children together. She said that her maiden name is Nunez, which is Mexican. She stated that Turner was "[absolutely not" a bigot and that she had never heard him say the *Page 17 
"N word." She further explained that Turner is not normally the kind of person who gets easily agitated. He usually keeps his anger to himself.
 {¶ 54} Antoinette stated that on August 5, 2005, she and her husband stopped at Castlebar around 7:00 p.m. to tell friends, including Forrest and his wife, that she was pregnant. After that, she and Turner went to a housewarming party for a couple of hours. She said that her husband did not drink at the party. When they got home around 10:30 or 11:00 p.m., her husband went back to Castlebar.
 {¶ 55} Turner then took the stand. He admitted that he has used the "N word" in the past, but that he never called anyone that. He said, "People tell ethnic jokes, and I've told a few myself. I have used it." He denied being a racist. He said that he did not use the word "nigger" on August 5, 2005, at Castlebar.
 {¶ 56} He corroborated his wife's testimony that he went back to Castlebar "[s]hortly after 11:00 [p.m.]." He said he drank four Miller Lite's prior to the incident in question, and was probably on his fifth when it occurred. Turner said that he sat down by Jackson because "I was ready to take a seat."
 {¶ 57} Turner said that he said "hi" to Forrest when he sat down, but then was mostly watching ESPN and drinking a beer. He said that he bought "a round" when he got himself a beer, including one for Jackson. Turner said that Jackson accepted the beer and thanked him for it. Other than that, Turner said that he did not talk to Jackson again. *Page 18 
 {¶ 58} Cuxton was sitting behind Forrest at one point, almost "back to back." Cuxton began banging the back of her chair against Forrest's chair. Forrest did not say anything to him about it. Turner then heard Cuxton call Forrest an "asshole" and make fun of his "crater face." He could not hear if Forrest responded to her. He said that he was not paying attention to it at first, but then he started to, because Cuxton was "out of control."
 {¶ 59} Turner stated that he then called the bartender, McKeown, over to him. He said to her, "Mindy, you see what's going on here? I want this to stop right now." He asked her what she was going to do about it. He further stated, "I said, you know, we're police officers. What are you going to do about this? You're the bartender. That's your job. I didn't extrapolate. That's your job. If somebody is getting out of line, cut them off. Tell them behave yourself, whatever you got to do." Turner said that he wanted McKeown to tell Cuxton to "knock it off." McKeown, however, "says I don't want anything to do with it, and she turns around and walks away from me."
 {¶ 60} When McKeown walked away, Turner said that as he went to turn back, "that's when I got hit in the face." Turner said that Jackson hit him in the face with an ashtray. He did not see an ashtray, but assumed it was an ashtray from the "clunk" that hit him. He had one injury, one to the left side of his face, from the ashtray. He had no other injuries on his face. He also had the injury to his head where he fell and hit the bar, which he did not remember receiving.
 {¶ 61} On cross-examination, Turner said that he never heard anyone in bar say, "buy every nigger in the bar a beer." If he would have, he would have "[r]un for cover," because "there were black people in the bar" who "wouldn't be happy." However, when asked how many black people he knew were in the bar, he replied that he was only aware of Turner. He also said that he expected the bartender, who weighed "hundred pounds soaking wet," to diffuse the situation because he was not getting paid to do it, she was. *Page 19 
 {¶ 62} Turner was asked if McKeown was confused when she included him in the note to Jackson about "these two jerks." Turner replied, "I stipulate that she was talking about me. I heard her on the stand." He also agreed that she was trying to diffuse the situation, but that she was not successful.
 {¶ 63} Again, Turner's and the city's appellate briefs state that Turner renewed his Crim.R. 29 motion on the inciting to violence charge at the close of all the evidence. The transcript on appeal does not include that oral motion.
 {¶ 64} On June 6, 2006, the jury found Turner guilty of inciting to violence. On June 16, 2006, Turner filed a written motion for acquittal pursuant to Crim.R. 29(C), or alternatively, a motion for a new trial.
 {¶ 65} The trial court sentenced Turner to one-hundred and eighty days in jail, which it suspended, and ordered that he pay a fine of $1000, which it suspended $500 of it. The court further placed him on one year of probation and denied Turner's motion for a new trial.
 {¶ 66} Turner appealed, raising the following three assignments of error: *Page 20 
 {¶ 67} "1. The trial court erred in denying appellant's motion for acquittal pursuant to Rule 29(C) of the Ohio Rules of Criminal Procedure with respect to the inciting to violence charge.
 {¶ 68} "2. The trial court erred as a matter of law in its responses to the jury's written questions thereby prejudicing appellant's right to a fair trial by tainting the jury's ability to weigh the evidence presented and apply the law accordingly.
 {¶ 69} "3. The verdict is contrary to the manifest weight of the evidence."
 {¶ 70} In his first assignment of error, Turner argues that the trial court erred in denying his Crim.R. 29(C) motion for acquittal, contending that his conviction was not supported by sufficient evidence to prove his guilt beyond a reasonable doubt.
 {¶ 71} Under Crim.R. 29, a trial court "shall not order an entry of acquittal if the evidence is such that reasonable minds can reach different conclusions as to whether each material element of a crime has been proved beyond a reasonable doubt." State v. Bridgeman (1978), 55 Ohio St.2d 261, syllabus. A motion for judgment of acquittal under Crim.R. 29 should only be granted where reasonable minds could not fail to find reasonable doubt. State v. Apanovitch (1987), 33 Ohio St. 3d 19,23.
 {¶ 72} The test an appellate court must apply in reviewing a challenge based on a denial of a motion for acquittal is the same as a challenge based on the sufficiency of the evidence to support a conviction. SeeState v. Bell (May 26, 1994), 8th Dist. No. 65356, 1994 Ohio App. LEXIS 2291. In State v. Thompkins (1997), 78 Ohio St.3d 380, the Supreme Court of Ohio set forth the test an appellate court should apply when reviewing the sufficiency of the evidence to support a conviction. It stated: *Page 21 
 {¶ 73} "[w] ith respect to sufficiency of the evidence, `"sufficiency" is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.' Black's Law Dictionary (6 Ed.1990) 1433. See, also, Crim.R. 29(A) (motion for judgment of acquittal can be granted by the trial court if the evidence is insufficient to sustain a conviction). In essence, sufficiency is a test of adequacy. Whether the evidence is legally sufficient to sustain a verdict is a question of law. State v.Robinson (1955), 162 Ohio St. 486 * * *. In addition, a conviction based on legally insufficient evidence constitutes a denial of due process.Tibbs v. Florida (1982), 457 U.S. 31, 45 * * *, citing Jackson v.Virginia (1979), 443 U.S. 307 * * *." (Parallel citations omitted.) Id. at 386-387.
 {¶ 74} When determining sufficiency of the evidence, we must consider whether, after viewing the probative evidence in a light most favorable to the prosecution, any rational trier of fact could have found all of the elements of the *Page 22 
offense proven beyond a reasonable doubt. State v. Shaffer, 11th Dist. No. 2002-P-0133, 2004-Ohio-336, at ¶ 17. Further, we note that the verdict will not be disturbed on appeal unless the reviewing court finds that reasonable minds could not have arrived at the conclusion reached by the trier of fact. State v. Dennis (1997), 79 Ohio St.3d 421, 430.
 {¶ 75} In order to determine if the city presented sufficient evidence to convict Turner of inciting to violence beyond a reasonable doubt, we must look to R.C. 2917.01. It provides:
 {¶ 76} "(A) No person shall knowingly engage in conduct designed to urge or incite another to commit any offense of violence, when either of the following apply:
 {¶ 77} "(1) The conduct takes place under circumstances that create a clear and present danger that any offense of violence will be committed;
 {¶ 78} "(2) The conduct proximately results in the commission of any offense of violence."
 {¶ 79} First, Turner argues that his conviction should not stand because Jackson did not commit an "offense of violence" as statutorily defined.
 {¶ 80} R.C. 2901.01(A)(9) defines "offense of violence" in part as:
 {¶ 81} "(a) A violation of section 2903.01 [aggravated murder], 2903.02 [murder], 2903.03 [voluntary manslaughter], 2903.04 [involuntary manslaughter], 2903.11 [felonious assault], 2903.12 [aggravated assault], 2903.13 *Page 23 
[assault], 2903.15 [permitting child abuse], 2903.21 [aggravated menacing], 2903.211 (2903.21.1) [menacing by stalking], 2903.22 [menacing], 2905.01 [kidnapping], 2905.02 [abduction], 2905.11 [extortion], 2907.02 [rape], 2907.03 [sexual battery], 2907.05 [gross sexual imposition], 2909.02 [aggravated arson], 2909.03 [arson], 2909.24 [terrorism], 2911.01 [aggravated robbery], 2911.02 [robbery], 2911.11 [aggravated burglary], 2917.01 [inciting to violence], 2917.02 [aggravated riot], 2917.03 [riot], 2917.31 [inducing panic], 2919.25 [domestic violence], 2921.03 [intimidation], 2921.04 [intimidation by attorney, victim or witness in a criminal case], 2921.34 [escape], or 2923.161 (2923.16.1) [improperly discharging firearm at or into habitation; school-related offenses], of division (A)(1), (2), or (3) of section 2911.12 [burglary], or of division (B)(1), (2), (3), or (4) of section 2919.22 [endangering children] of the Revised Code or felonious sexual penetration in violation of former section 2907.12 of the Revised Code[.]"
 {¶ 82} Turner contends that he did not urge another person to commit an "offense of violence" since Jackson was not accused of or charged with committing an "offense of violence." Turner maintains that Jackson being accused of or charged with an "offense of violence" is a "necessary prerequisite to establish that [Turner] committed the crime of inciting to violence," and if not, then it was "a legal impossibility" for Turner to be convicted of it. We disagree.
 {¶ 83} Under R.C. 2917.01, a defendant can be charged with and convicted of inciting to violence whether the other person urged to commit the offense of *Page 24 
violence actually commits the offense. The statute specifically states "when either" the conduct designed to urge another (1) creates a "clear and present danger" that an offense will be committed or (2) an offense is committed. The Committee Comments to R.C. 2917.01 also make it clear that "an offender may be guilty of a violation of this section even though no violence actually results from his conduct." Thus, whether Jackson (as the person incited) actually committed an offense of violence, or was charged with or accused of an offense of violence, would not matter. It is the "conduct" of the inciter that is the focus.
 {¶ 84} Turner also argues that he did not urge "another" person to commit an offense of violence as statutorily defined, because a conviction cannot stand when the person incited to violence is the victim.[3] We agree with Turner that there are no other cases "in which a defendant has been tried and convicted of inciting `another' to violence in which the other person is not incited to act in a violent fashion against some third party, but against the very person who is alleged to have incited him." This case presents a matter of first impression for this court, or as far as we can determine, any Ohio court. *Page 25 
 {¶ 85} In deciding this issue, we are guided by the well-established rules of statutory construction. A court's principle concern in construing statutes is to ascertain and give effect to the legislative intent behind the statute. Carnes v. Kemp, 104 Ohio St.3d 629,2004-Ohio-7107, at _16. In order to determine intent, courts must first look to the words of the statute itself. Id. Where the terms of the statute are clear and unambiguous, the terms should be given their plain and ordinary meaning. Barth v. Barth, 113 Ohio St.3d 27, 2007-Ohio-973, at _10.
 {¶ 86} In addition, R.C. 1.49 sets forth a list of factors a court may consider when determining the legislative intent of an ambiguous statute. The factors include: "(A) The object sought to be attained; (B) The circumstances under which the statute was enacted; (C) The legislative history; (D) The common law or former statutory provisions, including laws upon the same or similar subjects; (E) The consequences of a particular construction; (F) The administrative constructive of the statute." Finally, "statutes defining criminal offenses and penalties are to be strictly construed against the state and liberally in favor of the accused." State v. Jordan (2000), 89 Ohio St.3d 488, 492, citing R.C. 2901.04(A).
 {¶ 87} Looking at the language of R.C. 2917.01, we must determine if the legislature intended to include the circumstances present here; i.e., the defendant incited "another," where the other person was not incited to commit an offense of violence against a third party, but against the defendant. Again, the statute states in relevant part, "[n]o person shall knowingly engage in conduct designed *Page 26 
to urge or incite another to commit any offense of violence[.]" The statute does not mandate that the other person must commit the "offense of violence" against a third party. Moreover, under R.C. 2917.01, the conduct must incite another to commit any offense of violence. Thus, at first glance, it would appear to encompass the situation here; i.e., Turner incited Jackson to commit assault against Turner. Jackson is "another" person and assault is "any offense of violence."
 {¶ 88} Besides assault, however, none of the other "offenses of violence" would work the same way — if committed against the inciter. For example, could Turner have incited Jackson to rape him? Murder him? Stalk him? Thus, the statute is ambiguous and the legislative intent is not apparent from the language of the it. Therefore, we must look to other rules of statutory construction to determine the intent.
 {¶ 89} R.C. 2917.01 was first enacted on January 1, 1974. It is included in the chapter entitled "Offenses against the Public Peace." Nine years after it was enacted, the Twelfth District Court of Appeals reported that, "there is a paucity of case law construing this statute[.]" State v. Rutherford (Dec. 19, 1983), 12th Dist. No. CA83-03-013, 1983 Ohio App. LEXIS 11925, at 6. Over twenty years afterRutherford was decided, the case law construing the statute is not much more developed than it was in 1983. *Page 27 
 {¶ 90} The Committee Comments to R.C. 2917.01 provide guidance in determining legislative intent. The Comments state in part:
 {¶ 91} "This section provides a proscription against abuse of the right of free speech and expression by consciously, and under explosive circumstances, spurring others to violence. Although the section is the offspring of the crime of inciting to riot, it is not limited to that alone, but includes inciting one person or many to any offense of violence, including riot.
 {¶ 92} "The state has inherent authority to protect itself and its citizens from violence, and to this end may limit speech and expression which preaches it, provided there is an obvious and imminent danger that such conduct will actually result in the evil which the state has the right to prevent. Schenck v. United States [1919], 249 U.S. 47 * * *;Dennis v. United States [1951], 341 U.S. 494 * * *. This section specifically includes a `clear and present danger' test. Thus, advocating mob violence in an academic speech to a phlegmatic audience is unlikely to move listeners to take to the streets, and is not a violation of this section no matter how ill-judged the speaker's remarks may otherwise seem. On the other hand, advocating violent action to a tense audience in an already riot-torn area could well re-light the fuse, and may therefore be a violation of this section even though no violence actually results.
 {¶ 93} "Regardless of the apparent atmosphere in which an inciter's conduct takes place, if his speech or actions are designed to move others to violence and *Page 28 
actually do so, he is guilty of an offense under this section. In this respect, it is sufficient if he advocates some kind of violence and some kind of violence is committed as a result. If his conduct ultimately impels his listeners to commit arson, he cannot plead that his conduct only urged action amounting to simple riot. Conversely, if he urges arson, he cannot subsequently plead that the only incident which resulted was the `trashing' of a few parked cars. The former Ohio law on inciting only prohibited inciting to first degree riot. One of the phenomena of mob dynamics, however, is that assemblies which begin as merely disorderly frequently degenerate into Donnybrook Fairs. Agitators could use this phenomenon to their advantage, and escape accountability for their actions by carefully advocating a lesser species of violence, knowing that the odds ultimately favored more serious results." (Emphasis added.) (Parallel citations omitted.)
 {¶ 94} The comments repeatedly refers to "mob violence," "mob dynamics," "speaker," and "audience." They also refer to the "clear and present danger" test. "The `clear and present danger' test was an innovation by Mr. Justice Holmes in the Schenck case[.]"Dennis, supra, at 567. The United States Supreme Court stated:
 {¶ 95} "[W]e would save [the test] unmodified, for application as a `rule of reason' in the kind of case for which it was devised. When the issue of criminality of a hot-headed speech on a street corner, or circulation of a few incendiary pamphlets, or parading by some zealots behind a red flag, or refusal of a handful *Page 29 
of school children to salute our flag, it is not beyond the capacity of the judicial precess to gather, comprehend, and weigh the necessary materials for decision whether it is a clear and present danger of substantive evil or a harmless letting off steam." Id. at 568.
 {¶ 96} "This `clear and present danger' test was recognized inBrandenburg v. Ohio (1969), 395 U.S. 444, 447-448 * * *, as follows:
 {¶ 97} "`the constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action. * * * As we said in Noto v. United States [1961],367 U.S. 290, 297-298 * * *, `the mere abstract teaching (* * *) of the moral propriety or even moral necessity for a resort to force and violence, is not the same as preparing a group for violent action and steeling it to such action.'" (Parallel citations omitted.) State v. Smith (Oct. 22, 1992), 8th Dist. No. 61570, 1992 Ohio App. LEXIS 5403, at 12.
 {¶ 98} This case does not encompass the factual scenario for which the "clear and present" danger test was devised. Thus, it is our view that the comments show the legislature did not intend R.C. 2917.01 to apply to the circumstances in the case at bar, where Turner incited Jackson to fight Turner. Jackson would not be "another" person as envisioned by the legislature when it enacted R.C. 2917.01. *Page 30 
 {¶ 99} In addition, the Committee Comments state, "[w]hile an offender may be guilty of a violation of this section even though no violence actually results from his conduct, it should be noted that if violence does result he is guilty not only of an offense under this section but also of complicity in the resulting crime, under section 2923.03 of the Revised Code." Thus, in a case such as the one presented here, Turner could be convicted of complicity to assault — as a result of getting assaulted. See State v. Messer (Nov. 27, 2001), 10th Dist. No. O1AP-396, 2001 Ohio App. LEXIS 5256 (defendant shouted to another individual, "hit him harder, or I will shoot him"; defendant was convicted of inciting the other individual to violence and complicity to felonious assault).
 {¶ 100} Moreover, in cases where defendants have been charged with and convicted of inciting to violence, the common scenario encompasses the defendant inciting one or more persons to commit an act of violence against a third party (or parties). See, e.g., Smith, supra (police arrived at a scene where shots had been reported; a crowd of approximately fifteen to twenty young males had gathered; defendant shouted to the crowd, "`[w]e ought to jump these guys. They on our block now * * * and [w]e ought to shoot one of these motherfuckers. I got my 9.'"); State v. Brandon (June 28, 1989), 2d Dist. No. 88CA57, 1989 Ohio App. LEXIS 2597 (defendant told five of his friends that "`some Dayton guys were up on campus looking for him,' and `had bats and (* * *) might have guns." Defendant also said, "`grab the UZI' and `we're going over to campus to meet those guys * * * *Page 31 
[a]re you all with me or what * * * we can't get punked out.'"); State v.Cummings (Sept. 30, 1998), 11th Dist. No. 97-T-0068, 1998 Ohio App. LEXIS 4631 (defendant yelled to a crowd of about thirty people during his cousin's arrest: "`you fucking cops, you can't do this. You are always picking on us. We got numbers * * * there's more of us than them. We can take him. We can get the white man because there's more of us now.'" Defendant also yelled at one of the cops, "how do you feel now, we have got you out-numbered."); State v. Little (Nov. 2, 1995), 8th Dist. No. 68003, 1995 Ohio App. LEXIS 4846 (police arrived at scene to break up an unruly party; defendant goaded thirty to fifty people that they could "get them white honkey mother f-kers right now. There are more of us than them. Let's get them.").
 {¶ 101} Thus, following the logic of these cases, Turner would have had to incite another or others to commit an offense of violence against a third party, not himself. If Turner would have incited Forrest or someone else to commit an offense of violence against Jackson, then that would have been a common scenario of inciting "another" to violence. In none of the cases, however, did the defendant incite the *Page 32 
other person to commit an offense of violence against the defendant. Thus, it is our view that this case was not the type of case intended by the legislature when it enacted R.C. 2917.01.
 {¶ 102} If we held that the legislature intended such a case, then absurd results could occur. "It is a cardinal rule of statutory construction that a statute should not be interpreted to yield an absurd result." State ex rel. Ohio General Assembly v. Brunner,114 Ohio St.3d 386, 2007-Ohio-3780, at _114. For example, under R.C. 2917.01, a person can be convicted of inciting another person to commit rape (R.C.2907.02). If we apply that scenario to the facts here, then Turner would have incited Jackson to rape him. Thus, a victim of rape could theoretically be charged with inciting to violence (a woman jogging alone in a dark park at night could be construed as conduct designed to urge an offender to rape her).
 {¶ 103} Other hypothetical cases would create absurd results as well. For example, a person incites another to commit domestic violence (R.C.2919.25) against him or her (wife knows abusive husband does not like her to do something, she does it anyway, husband is incited to abuse her). Another example would be a person incites another to commit robbery (R.C. 2911.01) against him or her (store owner leaves cash drawer unlocked, knowing other stores in the area have been recently robbed, robber is induced to rob the store).
 {¶ 104} Indeed, looking at the definition of "offense of violence," we cannot find another example that would fit into the scenario here (besides the offense of violence Jackson was incited to commit here; i.e., assault).
 {¶ 105} Moreover, we agree with Turner that "[i]t is a common-sense conclusion that although theoretically possible, a victim of a crime can not [sic] be held criminally responsible for inciting the very crime of which he has been *Page 33 
victimized." In our hypothetical rape case, rape victims would be charged with the crime of inciting to violence. They would necessarily invoke their Fifth Amendment privilege against self-incrimination. They would not likely testify as victims against their violent attacker, making prosecution difficult, if not impossible. We do not believe this was the legistlature's intent.
 {¶ 106} R.C. 2917.11, disorderly conduct, seems more applicable to the facts of this case. Disorderly conduct is in the same Chapter of the Ohio Revised Code as inciting to violence, "Offenses against the Public Peace." "`[I]t is a fundamental rule of statutory construction that statutes relating to the same subject matter should be construed together' and `in construing such statutes in pari materia, they should be harmonized so as to give full application to the statutes.'"State ex rel. Thurn v. Cuyahoga Cty. Bd. of Elections (1995),72 Ohio St.3d 289, 294.
 {¶ 107} R.C. 2917.11(A)(1)-(3) provide three scenarios, all which could apply here: "(1) Engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior; (2) Making unreasonable noise or an offensively coarse utterance, gesture, or display or communicating unwarranted and grossly abusive language to any person; (3) Insulting, taunting, or challenging another, under circumstances in which that conduct is likely to provoke a violent response[.]" *Page 34 
 {¶ 108} The Committee Comments to R.C. 2917.11 further support our view that disorderly conduct, not inciting to violence, is more appropriate to the case at bar. They provide: "The gist of the first part of the section is perversely causing inconvenience, annoyance, or alarm to another in any of the listed ways: fighting, threatening, or engaging in wild behavior; making noise excessive under the circumstances; being offensively coarse; needling another in a way likely to incite him into a disorderly response; and unlawfully and without justification creating a dangerous or offensive condition. Some examples of violation include: * * * making remarks calculated to annoytheir target into taking a swing at his tormentor * * *." (Emphasis added.)
 {¶ 109} The Ohio Supreme Court has held that if a disorderly conduct conviction is based upon R.C. 2917.11(A)(2), involving the content ofthe speech and not the manner in how the words are spoken, then, a person may not be punished "unless the words spoken are likely, by their very utterance, to inflict injury or provoke the average person to an immediate retaliatory breach of the peace." State v. Homan (1979), 57 Ohio St.2d 129, paragraph one of the syllabus. Courts have called these words to be "fighting words." State v. Cunningham, 10th Dist. No. 06AP-145, 2006-Ohio-6373, at _22.
 {¶ 110} In the case sub judice, Turner's conduct, if proved, arguably could support a disorderly conduct conviction based upon the content of his speech, the manner in which the words were spoken, or his actions. Thus, if Turner incited *Page 35 
Jackson, it is our view that he did so within the sphere of R.C.2917.11. Turner did not, however, incite "another" as intended within the realm of R.C. 2917.01.
 {¶ 111} Therefore, we conclude that the evidence in this case is not sufficient to convict Turner of inciting to violence beyond a reasonable doubt since Turner did not incite "another" within the meaning of R.C.2917.01. Thus, the trial court erred when it did not grant Turner's Crim.R. 29(C) motion.
 {¶ 112} As such, Turner's first assignment of error is well taken.
 {¶ 113} Turner's second and third assignments of error have been rendered moot by our disposition of the first assignment.
 {¶ 114} Therefore, the judgment of the Cleveland Municipal Court is reversed and remanded for further proceeding consistent with this opinion.
It is ordered that appellant recover from appellee costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
PATRICIA A. BLACKMON, P.J. CONCURS; ANN DYKE, J., CONCURS IN JUDGMENT ONLY.
[1] Kane explained that as a bar back, he was responsible for restocking coolers, assisting the bartender, taking the trash out, and cleaning the tables.
[2] Although not entirely clear, it appears from Jackson's testimony, as well as Cuxton's later testimony, that Cuxton was seated next to Forrest after she returned from the restroom.
[3] What makes this case more confusing is the labeling of the persons involved. In typical inciting to violence cases, the defendant incites another or others to commit an offense of violence. The victim of that violence, if there is one, is a third party (we say "if there is one" because the offense of violence can be against property, as well as persons). In this case, however, Turner and the city refer to Jackson as the "victim," presumably because it was alleged that he was the "victim" of harassment — which was the inciting conduct. However, the city contends that Jackson was the one who was incited by Turner to commit the offense of violence-against the "victim" — who would be Turner (since he was hit by Jackson). *Page 1